**2016 UT App 173**

## THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF A.C.,
A PERSON UNDER EIGHTEEN YEARS OF AGE.

C.C.,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Per Curiam Decision
No. 20160524-CA
Filed August 11, 2016

Third District Juvenile Court, Salt Lake Department
The Honorable C. Dane Nolan
No. 1068910

Richard K. Clark and Lisa Lokken, Attorneys
for Appellant

Sean D. Reyes and John M. Peterson, Attorneys
for Appellee

Martha Pierce, Guardian ad Litem

Before JUDGES GREGORY K. ORME, J. FREDERIC VOROS JR., and
JILL M. POHLMAN.

PER CURIAM:

¶1      C.C. (Father) appeals the order terminating his parental rights in A.C. We affirm.

¶2      "Whether a parent's rights should be terminated presents a mixed question of law and fact." *In re B.R.*, 2007 UT 82, ¶ 12, 171 P.3d 435. "Because of the factually intense nature of such an inquiry, the juvenile court's decision should be afforded a high

degree of deference." *Id.* "Thus, in order to overturn the juvenile court's decision '[t]he result must be against the clear weight of the evidence or leave the appellate court with a firm and definite conviction that a mistake has been made.'" *Id.* (alteration in original) (quoting *In re Z.D.*, 2006 UT 54, ¶¶ 33, 40, 147 P.3d 401). Further, "[w]hen a foundation for the court's decision exists in the evidence, an appellate court may not engage in a reweighing of the evidence." *Id.*

¶3    The juvenile court concluded that several grounds supported termination of Father's parental rights. Under Utah Code section 78A-6-507, the finding of a single ground will support termination of parental rights. *See* Utah Code Ann. § 78A-6-507 (LexisNexis 2012). The juvenile court concluded that Father abandoned A.C., s*ee id.* § 78A-6-507(1)(a); neglected or abused A.C.; s*ee id.* § 78A-6-507(1)(b); was an unfit or incompetent parent; *see id.* § 78A-6-507(1)(c), and made only token efforts to support or communicate with A.C., *see id.* § 78A-6-507(1)(f). The court also found that "there had been a failure of parental adjustment on the part of [Father] in that he has been unable or unwilling, within a reasonable time, to substantially correct the circumstances, conduct, or conditions that led to placement of [A.C.] outside the home." *See id.* § 78A-6-507(1)(e). The court further concluded that the child had been in an out-of-home placement under the supervision of the juvenile court and the Division of Child and Family Services (DCFS), *see id*. § 78A-6-507(1)(d)(i); that Father had "substantially neglected, willfully refused, or has been unable or unwilling to remedy the circumstances that caused the child to be in an out-of-home placement," s*ee id.* § 78A-6-507(1)(d)(ii); and that "there is a substantial likelihood that [Father] will not be capable of exercising proper and effective parental care in the near future," *see id.* § 78A-6-507(1)(d)(iii). After finding grounds for termination, the court concluded it was in the child's best interest that Father's parental rights be terminated. *See id.* § 78A-6-503(12) (Supp. 2015).

¶4 "Utah law requires a court to make two distinct findings before terminating a parent-child relationship." *In re R.A.J.*, 1999 UT App 329, ¶ 7, 991 P.2d 1118. "First, the court must find that the parent is below some minimum threshold of fitness, such as a finding that a parent is unfit or incompetent based on any of the grounds for termination" in section 78A-6-507. *Id.* (citation and internal quotation marks omitted). "Second, the court must find that the best interests and welfare of the child are served by terminating . . . parental rights." *Id.* On appeal, Father challenges only the sufficiency of the evidence to support the juvenile court's findings that there are grounds for termination under sub-sections 78A-6-507(1)(b), (c), (d), and (e). Father does not challenge the juvenile court's additional findings that he abandoned A.C., *see* Utah Code Ann. § 78A-6-507(1)(a), and made only token efforts to avoid being an unfit parent, *see id.* § 78A-6-507(1)(f). Either of those unchallenged grounds is sufficient to support the juvenile court's determination that there were grounds for the termination of parental rights. Because Father does not challenge the statutory grounds of abandonment or token efforts, this court need not review his claim that the evidence was insufficient to support the remaining grounds for termination.

¶5 Father also challenges the sufficiency of the evidence to support the finding that it was in A.C.'s best interest to terminate parental rights, arguing that the court erred in finding "that the complete severance of any father-child relationship . . . was in the child's best interest." "Determining a child's best interest in termination of parental rights proceedings is a subjective assessment based on the totality of the circumstances." *In re G.J.C.*, 2016 UT App 147, ¶ 24. Therefore "evidence that proves one or more statutory grounds for termination of parental rights may also constitute evidence demonstrating that termination is in the child's best interest, but the court's focus should be on the impact of termination on the child." *Id.* ¶ 25.

¶6    In February 2015, DCFS received a referral regarding drug use and failure to meet minimum standards in the home where A.C. resided with Father. A.C. told a DCFS caseworker that Father and Father's girlfriend smoked substances that they heated in tinfoil and smoked using a straw. A caseworker's visit confirmed that the home did not meet minimum standards. There was no running water or electricity in the home, and there was evidence at the home that corroborated illegal drug use. After A.C. was removed, Father told the caseworker that he was interested in reunification and wished to receive services. However, Father failed to attend a pretrial conference on March 10, 2015, and a continued pretrial conference on March 24, 2015, and also failed to contact or communicate with DCFS. The juvenile court adjudicated the State's petition, finding that A.C. was neglected or abused by Father. Father failed to attend the disposition hearing on May 5, 2015. Therefore, the juvenile court did not order reunification services, and the court set a permanency goal of adoption for A.C.

¶7    Following the trial in May 2016, the juvenile court found that Father had no contact with A.C. after the child's removal in February 2015. Although Father agreed to attend four supervised visits arranged through DCFS, he did not appear for those visit—"three times because of inconvenience and once because he was confused as to the visit location." The court found that the missed visits were hard for A.C. because he was looking forward to seeing Father. After the missed visits, A.C. was angry, physically violent, and aggressive. Father did not write A.C. any letters or make any phone calls during the pendency of the case. He did not attend a child and family team meeting. Father failed to attend court hearings on August 11, 2015, September 22, 2015, October 20, 2015, and December 8, 2015. He attended a hearing on October 6, 2015, when he was incarcerated and was transported to court. During the course of the case, Father "paid no child support, provided no clothes, food, toys, gifts, birthday cards, Christmas cards, or anything

else indicating an interest in [A.C.] or his well-being." Accordingly, the juvenile court concluded that Father abandoned A.C. by engaging in conduct that indicated "a conscious disregard of the obligations he owes to the child as a parent which has led to the destruction of the parent-child relationship." *See* Utah Code Ann. § 78A-6-507(1)(a).

¶8 The juvenile court further found that A.C. had been in the same foster home since his removal in February 2015. The foster parents are willing to adopt A.C. The juvenile court found that A.C. was fully integrated into the home and bonded with the family and has a healthy and positive relationship with each foster parent. When A.C. arrived in the foster home, he was sad and exhibited difficult behaviors including physical aggression towards persons and property. He had difficulty understanding and accepting consequences for his behavior and understanding the roles of parents and children. The foster family participates in A.C.'s therapy, provides structure and stability, has a suitable home, and meets A.C.'s physical, emotional, and medical needs. A.C. has progressed from struggling with learning the alphabet to reading books at grade level. Father does not challenge any of these specific findings supporting the best interest determination.

¶9 Furthermore, at the termination trial, Father admitted that although he knew A.C. was in DCFS custody, he did not stay in contact with the caseworker. He admitted he provided no clothing, gifts, or letters. He admitted he did not attend any scheduled visits. He claimed he was not given notice of the hearings he missed. He was incarcerated for two weeks in May 2015 and from September 12 through the end of October 2015, and was again incarcerated on November 12 and remained incarcerated at the time of trial awaiting resolution of several criminal charges. Father testified that he would have housing and employment through family members in Utah or Arizona when he was released. Although Father was unable to take custody of A.C., he argued that because the foster parents were

willing to agree to permanent custody and guardianship if they were not allowed to adopt, the court should leave A.C. in their custody until Father was released and became a fit parent. He argued it would be in A.C.'s best interest to preserve Father's parental rights and A.C.'s familial relationships.

¶10    The juvenile court rejected Father's arguments. The court found that Father was currently incarcerated on multiple felony charges and was "at risk of a long-term prison sentence." Father had a history of substance abuse and failure to comply with criminal court orders. He was unable to provide for A.C.'s basic needs. Therefore, the juvenile court found that it was in A.C.'s best interest of A.C. to be in a stable and consistent home and to be adopted by parents who are willing and able to properly care for him and protect him from abuse and neglect. The juvenile court's determination of A.C.'s best interest was amply supported by the evidence before it. As this court recently stated, "the speculative possibility of Father experiencing a dramatic transformation and providing [A.C.] with a positive, loving, nurturing relationship with his extended family must be weighed against Father's real world actions as found by the court," which included, in this case, Father's abandonment of A.C., his repeated incarceration, and his failure to make anything more than token efforts to become a fit parent and regain custody. *See In re G.J.C.*, 2016 UT App 147, ¶ 31 (internal quotation marks omitted).

¶11    Because "a foundation for the court's decision exists in the evidence," we affirm the juvenile court's order terminating Father's parental rights. *In re B.R.*, 2007 UT 82, ¶ 12, 171 P.3d 435.

——————